# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

———————————————————  :
                                               :
R.C. BEESON, INC.,                             :
                                               :          Civil Action No. 07-4806 (PGS)
                                               :
            Plaintiff,                         :
                                               :
v.                                             :          **OPINION**
                                               :
THE COCA-COLA CO., JOSEPH E.                   :
SEAGRAM & SONS, INC., ET AL.,                  :
                                               :
                                               :
            Defendants.                        :
———————————————————:

**<u>SHERIDAN,  U.S.D.J.</u>**

      This matter comes before the Court on Defendants' motion to dismiss and Plaintiff's cross motion for summary judgment.  The plaintiff is R.C. Beeson, Inc., a New Jersey corporation.  Defendants are four out-of-state corporations: (1) the Coca-Cola Company ("Coca-Cola"), (2) Pernod Ricard USA, LLC ("Pernod"), (3) Diageo North America, Inc. ("Diageo"), and (4) Seagram & Sons, Inc. ("Seagram"), which no longer exists and is a predecessor in interest of the first three defendants.  Plaintiff brings two claims: breach of contract and unjust enrichment.

      Beeson was a consultant for Seagram, and in or around 1982, Beeson invented and developed Seagram Mixers (that is Seagram's ginger ale, tonic water, etc.) for Seagram, which then granted non-party Coca-Cola Bottling Company of New York, Inc. ("Coke NY")[1] a license to sell Seagram Mixers in exchange for an agreed-upon royalty.  Seagram then negotiated Beeson's interest payments

---

[1] Coke NY is a separate and distinct entity from defendant Coca-Cola.

from sales of Seagram Mixers, and the two parties agreed that if there was a material change in the license fees, upon which Beeson's interest was based, Seagram would negotiate in good faith with Beeson the amount of interest to be paid.  In 1993 Seagram made a change to its licensing fees, which in turn changed the amount of interest it paid to Beeson.  Plaintiff noticed a change in its interest payments and began inquiring about and disputing these payments starting at least as far back as the mid 1990s.  Beeson continued to dispute the payments, but Beeson also continued to receive interest payments for sales of Seagram Mixers.  On October 4, 2007, Beeson filed the complaint at issue.

This begs the question of why Beeson waited so long to bring suit.  This Court must decide whether the statute of limitations has expired, which will determine whether it has jurisdiction over this matter or whether it must dismiss under Federal Rule of Civil Procedure 12(b)(6).  The governing statute of limitations for both claims is six years, pursuant to New Jersey law for recovery under contractual claims.  Plaintiff argues that after the alleged material change in royalties, every time Defendants made an interest payment to Beeson, a new cause of action accrued, triggering six more years during which Plaintiff could bring suit.  Plaintiff seeks six years worth of damages dating back from when it filed suit.  Defendants counter that if Beeson had a cause of action, it only happened once–in or around 1993; thus, Plaintiff is time barred from bringing this suit.  This Court finds that the statute of limitations on Plaintiff's claims lapsed long ago and will dismiss this action under Federal Rule 12(b)(6).

I.

The facts are largely undisputed.  On January 1, 1982, Beeson entered into a consulting agreement (the "1982 Consulting Agreement") with Seagram to assist it with its beverage business

as a consultant.  The contract offered Plaintiff monthly compensation, and additionally, the parties agreed that they would "negotiate in good faith" the interest Seagram would pay to Beeson for each project Beeson developed or brought to Seagram.  ¶ 3.

Later in 1982, Beeson created, invented, and developed Seagram Mixers for Seagram, which then entered into an agreement dated October 8, 1982 (the "1982 License Agreement") with Coke NY, by which Seagram granted Coke NY licenses to use Seagram's trademarks to sell Seagram Mixers.[2]  Article IX of the agreement provided that Coke NY would pay to Seagram a royalty of $.05 for each case of Seagram Mixers sold.  Additionally, Article IX provided that this royalty "shall increase at a compound rate of ten percent per year . . . ."

By a second agreement dated October 8, 1982 (the "1982 Interest Agreement"), Seagram honored its earlier promise from the 1982 Consulting Agreement to negotiate Beeson's interest payments.  The 1982 Interest Agreement provided that the interest to be paid to Beeson in accordance with Paragraph 3 of the 1982 Consulting Agreement for Seagram Mixers would be twenty percent of the royalties received by Seagram from Coke NY under Article IX of the 1982 License Agreement.  So pursuant to these terms, Beeson would receive twenty percent of the $.05 per case royalty payment, which would increase at ten percent per year, that Seagram received from Coke NY.

---

[2]  Other entities related to Seagram are parties to the 1982 License Agreement and other agreements that are the subject of this action.  These entities include Joseph E. Seagram & Sons, Ltd. and the Seagram Company, Ltd.  The Court will not distinguish among these entities but will instead refer to them all as Seagram, as the distinction would have no bearing on this litigation.

The 1982 Interest Agreement further provided that if Seagram made a material change to the Seagram Mixers royalties, Seagram would "negotiate in good faith" with Beeson its interest payments.  The 1982 Interest Agreement states:

> [I]n the event that Seagram and Coke NY amend or supplement the License Agreement in a manner which materially changes the amount of the royalties payable to Seagram pursuant to Article IX, *Seagram shall negotiate in good faith with [Beeson]* the amount of interest to be received by [Beeson] under the amended or supplemented License Agreement, which shall be in lieu of the interest granted hereby. (emphasis added).

Coke NY subsequently assigned its rights under the 1982 License Agreement for the Seagram Mixers to non-party Premium Beverages, Inc. ("Premium").  Seagram and Premium entered into a license agreement, which amended the 1982 License Agreement as of January 1, 1986 (the "1986 License Agreement").  This agreement similarly provided in its Article IX that the royalties Premium paid to Seagram would increase at a compound rate of ten percent per year commencing on November 1, 1985.

Beeson and Seagram then signed a new agreement dated February 18, 1987 (the "1987 Interest Agreement"), which extended the terms of the 1982 Interest Agreement to sales in Canada and confirmed the terms of the agreement for sales in the United States.  That is, Seagram agreed to pay to Beeson twenty percent of moneys received by Seagram for sales of Seagram Mixers in the United States and Canada.

Plaintiff's alleged cause of action arises out of an agreement dated February 1, 1993 (the "1993 License Agreement") between Seagram and Premium.  Where under the 1982 and 1986 License Agreements there was a ten percent increase in royalty payments per year, the 1993 License

Agreement stipulated for a yearly increase equal to the percentage increase in the Consumer Price Index ("CPI") for nonalcoholic beverages.  Paragraph 6(a) of the 1993 License Agreement states in relevant part:

> Such royalty shall increase on November 1, 1993, and thereafter on November 1 each year, by an amount equal to the percentage increase in the Consumer Price Index for all Urban Consumers: U.S. City average, Nonalcoholic beverages, for the twelve months ending on the preceding August 31.

In turn, Beeson's twenty percent share of the royalties no longer increased yearly with the ten percent rise in Seagram's royalty payments and instead would only increase if and when the CPI would rise.

Beeson alleges that the 1993 License Agreement caused a material change in the royalties payable to Seagram and that Beeson was never notified of the change.  From the 1993 License Agreement to this day, Beeson alleges that there have been no good faith negotiations.  Beeson acknowledges that since the mid 1990s and on an ongoing basis thereafter, it has "inquired about, and challenged, the statements and amounts [of interest] sent to it and asked for explanations as to, and disputed, the calculations."  (Amended Complaint ¶ 12).

Seven years later, on August 10, 2000, Beeson and Seagram executed yet another Agreement (the "2000 Interest Agreement"), which confirmed that Beeson would continue to receive twenty percent of the royalties received by Seagram for sales of Seagram Mixers in the United States and Canada.  Seagram also agreed to make these interest payments and statements to Beeson on a quarterly basis.

During the negotiation of the 2000 Interest Agreement, Beeson alleges that Seagram requested that it acknowledge that Seagram satisfied in full all of its obligations to Beeson through

that time. (Amended Complaint ¶ 14).  Beeson rejected the request but confirmed within the 2000 Interest Agreement that it accepted Seagram's "'manner of reporting'" but preserved "'the right to audit the books and records of Seagram to confirm the accuracy of the payments . . . . '" *Id.* (quoting the 2000 Interest Agreement).  Seagram also preserved its position with regard to any limitation of action defense.  In the 2000 Interest Agreement, Beeson's right to audit is limited to "time periods permitted by applicable law" and is "subject to any and all defenses available to Seagram under applicable law."

Despite the overt references of Seagram that Beeson may have statute of limitations issues, Beeson idly stood by except to challenge "on an ongoing basis" the reports and amounts of interest it received from Seagram for sales of Seagram Mixers.  (Amended Complaint ¶ 15).

In or about 2001, corporate ownership of Seagram changed rapidly.  Initially, Pernod acquired Seagram and became the successor to Seagram's obligations regarding Seagram Mixers, pursuant to the prior agreements.  Defendants inform the Court that around this time, Diageo had a share of these obligations as well.  Thereafter in  2002, defendant Coca-Cola acquired the rights to Seagram Mixers and became the successor to these obligations to Beeson.  Since the third quarter of 2002, Coca-Cola has sent statements and payments to Beeson. According to the Amended Complaint, in May 2007, Beeson disputed the payments in a letter from its attorney (Ronald Taft) to James Koelemay of Coca-Cola.  The Amended Complaint at Paragraph 22 states:

> By letter dated May 23, 2007, from Ronald S. Taft, Esq., ("Taft") on behalf of Beeson, to James M. Koelemay, Jr., on behalf of Coca-Cola, Beeson identified the correct calculation of royalties due to Beeson for the period January 1, 2000 through and including the first quarter of 2007.  The amount due for said period is no less than seven million two hundred twenty six thousand, seven hundred ninety three dollars and five cents ($7,226,793.05) plus interest.

Plaintiff claims breach of contract and unjust enrichment. In alleging breach of contract, Beeson contends that after entering into the 1993 License Agreement, Seagram breached its promise from the 1982 Interest Agreement that if a material change occurred in the amount of royalties payable to Seagram that Seagram "shall negotiate in good faith with [Beeson] the amount of interest to be received by [Beeson]."

Plaintiff has calculated that Defendants owe approximately $7.6 million in damages.  This amount is presumably the difference between what Beeson received and what Beeson would have received if it continued to be compensated via a ten percent increase in royalty payments per year. Plaintiff asks for this amount plus interest as compensatory damages for breach of contract. Plaintiff seeks damages dating back six years from October 4, 2007, the commencement of this action.[3] Beeson brings a second claim, for unjust enrichment, alleging that due to Defendants' breach of contract, Plaintiff has been damaged, and Defendants have been unjustly enriched.

## II.

This court will grant Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The statute of limitations has expired; therefore, Plaintiff has failed to state a claim upon which relief may be granted.

In deciding whether to dismiss a complaint for failure to state a claim upon which relief can be granted, the court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *ALA v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994); *accord Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994).  While a

---

[3]      Plaintiff  reserves its right to seek further damages from 1993 to approximately 2000 depending on whether Defendants acted unlawfully in not disclosing the 1993 change in the royalty rate.

court is generally limited to the pleadings in deciding a motion to dismiss, "we may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006 ) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) (citation omitted). This Court will use the relevant agreements between the parties to decide this motion.

The Court may dismiss a plaintiff's complaint under Fed. R. Civ. P. 12(b)(6) if there are not "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). The factual allegations must be enough to raise a right of relief above the speculative level. *See Wilkerson v. New Media*, 522 F. 3d 315, 322 (3d Cir. 2008). When deciding a motion to dismiss on statute of limitations grounds, the Third Circuit has instructed courts to ask whether the "time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir.1989) (citation omitted); *see also Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516 (3d Cir. 2007).

The applicable statute of limitations for both of Plaintiff's claims, breach of contract and unjust enrichment, is six years. Under New Jersey law, "[e]very action . . . for recovery upon a contractual claim or liability, express or implied . . . shall be commenced within 6 years next after the cause of any such action shall have accrued." N.J. Stat. Ann. § 2A:14-1 (2000).

Generally, the purpose of a statute of limitations is to weed out stale claims where the reliability of the evidence becomes suspect. *See Miller v. Fortis,* 475 F.3d at 522. According to the Supreme Court, such statutes are:

> designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*Order of R.R. Tels. v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-349 (1944).  The Third Circuit has recently reaffirmed that purpose. *See Miller v. Fortis*, 475 F.3d at 522.  In *Miller*, the plaintiff applied for disability benefits under a long-term disability policy in 1987.  When his employer reported to his insurer his salary, upon which his benefits were to be determined, the employer reported $690 per week, instead of the $768 per week that Mr. Miller was actually making prior to his disability.   The plaintiff continued to receive underpaid benefits, and it was not until 2002 that he realized that his payments were less than they should have been.  The plaintiff brought suit in 2003 under ERISA alleging that his employer and insurer unlawfully denied him benefits.[4]

The court found that Mr. Miller's entire claim was time barred, explaining that upon receiving his first incorrect benefits payment, Mr. Miller's ERISA claim was "known or should [have been] known, to the plaintiff." 475 F.3d at 521 (citation omitted).  Mr. Miller's receipt of that

---

[4]  The statute of limitations analysis in *Miller v. Fortis* is not limited to ERISA actions. *See Henglien v. Colt Industs. Operation Corp.*, 260 F.3d 201, 213 n.8 (3d Cir. 2001) (quoting *Tester v. Reliance Standard Life Ins. Co.*, 228 F.3d 372, 375 (4th Cir.2000)) ("'In reviewing the terms of an ERISA plan, we are mindful that ERISA plans are contractual documents, and established principles of contract and trust law govern their interpretation.'").

first incorrect benefits payments constituted "clear repudiation," that triggered the six-year statute of limitations. *Id.*

Further, the court explicitly declined to adopt a continuing violation theory, whereby a new cause of action would accrue every time Miller received a benefits payment. *Id.* at 522. The Third Circuit explained that the plaintiff should have discovered that he was being underpaid, yet simply failed to investigate his benefit determination for fifteen years. *Id.* at 523. The Third Circuit was mindful that the continuing violation theory undermines the clear purpose behind the statute of limitations. The court noted that if it were to adopt a continuing violation theory in such circumstances, "a plaintiff could receive [payments] for decades before deciding to investigate the accuracy . . . a plaintiff could thereby trigger the statute of limitations at his own discretion, creating an indefinite limitations period. We decline to invite such a result." *Id.* at 522.

The case at hand is analogous to *Miller*. Plaintiff here had actual knowledge in the mid nineties that Seagram changed the methodology for determining the royalty upon which the interest payments were based. Although Plaintiff disputed its payments at that time, and in 2000 negotiated an audit provision in order to preserve its rights regarding interest payments, it still failed to act. In fact, Plaintiff stalled for 14 years. The need to invoke the statute of limitations becomes evident here. Beeson sat on its claim through several transfers of Seagram's license agreement. Obviously, the parties to the current contracts are different; the original parties are probably unavailable; and the memories of the  witnesses have faded.

Plaintiff contends that it is entitled to damages for the six years preceding the filing of the complaint. According to Plaintiff, the contract requires installment payments, and since Defendants have failed to negotiate in good faith since the alleged 1993 material change, each subsequent

payment has given rise to a separate cause of action for breach of contract with its own six-year statute of limitations.  For this proposition, Plaintiff relies on the installment contract theory and cites principally to two New Jersey Supreme Court cases,  *County of Morris v. Fauver*, 707 A.2d 958 (N.J. 1998) and *Metromedia Co. v. Hartz Mtn. Assocs.*, 655 A.2d 1379 (N.J. 1995).

Under the installment contract theory, claims based on installment contracts, or other divisible, installment-type payment requirements, will accrue with each subsequent installment. *Fauver*, 707 A.2d at 971.  "In other words, a new statute of limitations begins to run against each installment as that installment falls due and a new cause of action arises from the date each payment is missed."  *Id*.  New Jersey Courts have utilized the installment contract approach analysis for continuous contracts with some frequency.  Justice O'Hern observed:

> Courts have used the "installment contract" approach in a variety of situations. Coupons on county bonds due annually, periodic payments for promissory notes, periodic payments under a divorce settlement, and monthly payments under an equipment lease have all been considered installment contracts for the purpose of determining accrual of a cause of action.

*Metromedia*, 655 A.2d at 1381.  Generally, these cases involve matters where there is a miscalculation of money due, or failure to pay monies due for some inadvertent reason.

Similarly, when a party is in continuous breach of a performance obligation, courts find that this continuous failure to honor a contract creates a series of mini breaches wherein a new cause of action perpetually accrues.  A continuous breach allows a plaintiff to sue for all damages going back six years even if the original breach occurred more than six years ago.  *See Nat'l Util. Serv., Inc. v. Cambridge-Lee Industs. Inc.*, 199 Fed. Appx. 139, 142 (3d Cir. 2006); *accord Ballantyne House Assocs. v. City of Newark*, 635 A.2d 551, 555-56 (N.J. Super. Ct. App. Div. 1993).

Plaintiff relies on *Metromedia* and *Fauver* to argue that it can sue for six years worth of contractual damages.  Applying the installment contract approach, the court in *Metromedia* found that where the defendant agreed to reimburse the plaintiff for cleaning costs, and for six and one half years the plaintiff paid for the service but did not bill the defendant, the plaintiff's enforceable right to bring a cause of action arose each and every month, after completion of the cleaning services and the accumulation of the right to payment.  655 A.2d at 1381. As a result, the plaintiff in *Metromedia* could recover on those bills from the months for which the six-year statute of limitations had not expired at the time the plaintiff brought suit, but for all bills submitted prior to six years before the suit was filed, the plaintiff was time barred from recovery.  *Id*.

In *Fauver*, the County brought a breach of contract action against the State for failure to follow payment provisions of its contract for housing state prisoners in the County's correctional facilities.  Pursuant to a 1983 contract, the per diem reimbursement rate for housing state prisoners was linked to the average daily cost of housing in state prisons in Trenton, Rahway, and Leesburg during that fiscal year.   Before any state prisoners were housed in the county jail, the State sent a letter, dated September 7, 1984, to the County advising it that the State had increased the per diem rate to $45.00 per prisoner.  Initially, from 1985-1987, there was no breach because the state average was less than $45.00.  However, subsequent to 1988, the state average exceeded the $45.00 that the State continued to pay, underpaying the contractual rate.  The County did not file suit for breach of contract until seven years had elapsed since the initial contract had been signed.

The court applied the installment contract theory to hold that every time the County submitted a new voucher, and the State underpaid the correct amount, the County's cause of action on that voucher accrued.  707 A.2d at 973.  However, the County's recovery was substantially

-12-

limited by the New Jersey Contractual Liability Act, which bars recovery in contract actions against the State if a notice of claim is not submitted to the State within ninety days of the claim's accrual. *Id.* The County waited until April 7, 1992 to submit its notice of claim to the State and brought its lawsuit on October 14, 1992. The court held that the County was entitled to reimbursement for the difference between the $45.00 it received per prisoner and the appropriate contract rate for all invoice periods beginning ninety days prior to the County's submission of its notice of claim. *Id.*

However, the installment contract theory does not apply in the instance of a repudiation or a total breach. When there is an installment or continuous contract, repudiation or total breach will do two things: first, it will create a claim and trigger the statute of limitations, and second, it will prevent a subsequent breach from giving rise to a new cause of action. *See Cambridge-Lee*, 199 Fed. Appx. at 142-43; *Metromedia*, 655 A.2d at 1381. A repudiation "'entails a statement or 'voluntary affirmative act' indicating that the promisor 'will commit a breach' when performance becomes due.'" *Cambridge-Lee*, 199 Fed. Appx. at 143 (quoting *Franconia Assocs. v. U.S.*, 536 U.S. 129, 143 (2002) (quoting Restatement (Second) of Contracts § 250 (1981))).

Unlike in *Metromedia* and *County of Morris*, there is a repudiation here. When Seagram recalculated the royalty payment by replacing the ten percent annual increase with an annual increase based on the CPI and then sent Beeson payment based on that change, Plaintiff knew the royalty contract was fundamentally changed. The recalculation was a voluntary affirmative act indicating that Seagram would commit a breach when performance became due, and it signaled anticipatory repudiation of performance in the future. *See Cambridge-Lee*, 199 Fed. Appx. at 143; *Franconia Assocs*, 536 U.S. at 143 (2002). As a result, this repudiation prevents the application of the

continuing violation or installment contract theory. *Miller*, 475 F.3d at 516. *Cf. Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007).[5]

To allow Plaintiff's claim to proceed defies common sense. Obviously, the 1982 Interest Agreement provided Beeson with interest payments *in futuro*. At that time, the parties recognized that change over the years was inevitable. As a result, they also included a duty to negotiate provision as a fair means of resolving disputes emanating from unforeseeable circumstances which may arise in the distant future. The purpose of the duty to negotiate provision was to contemporaneously and in good faith resolve issues in light of the circumstances at the time of the change. The restructuring of the royalty payment is the type of event of repudiation the original parties envisioned would trigger the duty to negotiate provision. If suit were brought timely, *e.g.*, 1993, to compel negotiations, the remedy of specific performance would have been available and most likely would have resolved the issue at hand. By Mr. Beeson's and his corporation's sitting on their hands for so long, Beeson knowingly undermined the original intent behind the duty to negotiate provision and, as a result, Beeson's own long-term interest. This is a case where "the right to be free of stale claims" "prevail[s] over the right to prosecute them." *Order of R.R. Tels.*, 321 U.S. at 349. The Defendants' motion to dismiss is granted. This case is dismissed with prejudice.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.


September 26, 2008

---

[5] Our decision does not address potential claims in the event of subsequent changes to Seagram Mixers royalty payments.